TAYLOR, Presiding Judge.
The appellant, Jessie Fillmore, was convicted of homicide by vehicle, a violation of § 32-5A-192, Code of Alabama 1975. He was sentenced to five year’s imprisonment; that sentence was split and he was ordered to serve two years in jail and the remainder on probation.
The state’s evidence tended to show that on August 27, 1992, the appellant failed to stop his 18-wheel semitrailer at a stop sign and as a result his vehicle collided with an automobile driven by Hickman Lester Bam-berg. Bamberg died 17 days after the accident as a result of the injuries he sustained in the collision.
Charlie Lee Woods testified that at about 6:00 p.m. on August 27, 1992, the appellant arrived at Miller Lumber Company in Selma to pick up a load of sawdust. Woods was employed by Miller Lumber as a front end loader operator. Woods testified that he always stayed at work until after 5:00 p.m. in order to load or unload any trucks that might arrive. Woods testified that he knew the appellant because the appellant had picked up loads of sawdust four or five times in the past. Woods loaded the appellant’s semitrailer, and the appellant left to deliver the load. Woods testified that the appellant returned about one hour later for another load. Woods again loaded the appellant’s truck. The appellant invited Woods to ride with him on this delivery and Woods accepted. Woods testified that they drove on Highway 14 toward County Road 80 and that he drank two cans of beer during the trip. He stated that he got the beers out of a paper sack that contained three cans of beer. Woods testified that during the trip the appellant was *143 drinking something from a can, but that he did not notice what it was.
Woods testified that from the direction he and the appellant were traveling, the intersection of Highway 14 and County Road 80 is at the bottom of a long downhill stretch and there is a stop sign at the intersection for vehicles on Highway 14. Woods testified that when they got to the top of the hill before the downhill stretch leading to the intersection he told the appellant, “Don’t forget the stop sign down there.” However, Woods said that he did not see the appellant apply the brakes or downshift in order to slow the truck. Woods testified that the appellant did not stop and that he drove through the intersection at about 15 miles per hour, without stopping for the stop sign. At the same time a car had arrived at the intersection from the right. The appellant’s truck collided with the car. Woods testified that the appellant’s truck ran off the road to the left into the woods and the car remained in the intersection. Woods got out of the truck and walked to the intersection. He stated that he saw Bamberg in the car and that he appeared to be breathing.
About three minutes later Freddie Brady arrived at the scene of the accident. Brady testified that he lived about 200 yards from the intersection. Woods testified that he went back to the truck and got a fire extinguisher because a fire had started near Bam-berg’s vehicle. Woods began to put out the fire and Brady ran back to his house to telephone the state troopers. Brady testified that after making the telephone call he returned and helped Woods put out the fire. He saw Bamberg lying in the car; it appeared that his head “was busted real bad and he didn’t appear to be breathing really good.” About five minutes later an ambulance and a state trooper arrived.
Brady testified that Woods walked back to the truck and he heard Woods talking to somebody. He stated that this was the first time he knew that somebody else had been in the truck with Woods. Brady then saw the appellant get out of the truck and walk around to the rear of the truck. The appellant mumbled something and then walked off. Brady testified that he then heard the appellant “rattling around in the truck and going out into the woods.” According to Brady, the appellant repeated this action two or three times.
The appellant then began talking with the state trooper. Brady testified that he was standing within a few feet of the appellant and that he could smell alcohol on the appellant. Brady also testified that the appellant appeared to have been drinking because he was “really wobbly and he talked like he was pretty well tight.” Also, Brady stated that the appellant told him that he had drunk a couple of beers. However, Brady stated that the appellant did not appear to be drunk.
State Trooper Chris Ellis testified that he arrived at the scene at about 8:00 p.m. Ellis stated that as he began to talk to the appellant he could smell alcohol and that the appellant’s eyes were bloodshot. The appellant denied that he had been drinking. Ellis then spent about 10 minutes talking with the appellant, gathering background information. The appellant then took a preliminary breath test which indicated the presence of alcohol. Ellis then placed the appellant under arrest for driving under the influence of alcohol. Ellis and Brady both testified that they found some Budweiser and Busch Light beer cans in the bushes 10 to 15 feet from the appellant’s truck. Ellis found a cold, unopened can of Busch Light in a paper sack in the same area in which the other beer cans were found.
Ellis took the appellant to the Dallas County jail to administer an Intoxilyzer 5000 breath test. Ellis testified that the appellant was able to blow only a partial or “deficient” breath sample. The Intoxilyzer 5000 showed the blood alcohol content of the deficient sample to be .087%.
The appellant raises four issues on appeal.
I
The appellant first contends that the trial court erred by allowing the state to indict him for, and then to present evidence at trial on, one count of manslaughter, a violation of § 13A-6-2, Code of Alabama 1975, and two counts of homicide by vehicle (commonly referred to as vehicular homi *144 cide), a violation of § 32-5A-192, Code of Alabama 1975. More specifically, the appellant contends that the trial court should have required the state to elect which offense it intended to prove at trial.
The record reflects that the trial court in its jury instructions charged the jury on manslaughter and the lesser included offenses of criminally negligent homicide and vehicular homicide. The trial court further instructed the jury that if it did not find the appellant guilty beyond a reasonable doubt on the charge of manslaughter that it could convict him of one of the lesser included offenses. In effect, the jury was not given any instruction to the effect that it could convict the appellant for more than one offense. The jury could not have convicted him of both manslaughter and vehicular homicide. Furthermore, any error charging lesser included offenses in the indictment was cured by the court’s charge, which made it clear that those offenses were lesser included offenses and mere surplusage in the indictment. In this instance, we believe any error was harmless. “Specification of an offense in an indictment or information shall constitute a charge of that offense and of all lesser offenses necessarily included therein.” Rule 13.2(c), Ala.R.Crim.P.
Moreover, the appellant was found guilty of homicide by vehicle, which thereby acquitted him of the greater charge of manslaughter. The charge upon which the conviction rests is the only one before us for appellate review. McCain v. State, 611 So.2d 1123, 1124 (Ala.Cr.App.1992).
II
The appellant next contends that the trial court erred by allowing the results of his breath test taken at the scene and the subsequent Intoxilyzer 5000 test to be received into evidence. Specifically, he contends that doing so violated his right against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution and his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). More specifically, he contends that the state trooper at the crime scene should have given him Miranda warnings before administering any breath tests because, he says, the trooper should have known he was investigating a felony.
In Schmerber v. California, 384 U.S. 757, 761-64, 86 S.Ct. 1826, 1830-32, 16 L.Ed.2d 908, 914-16 (1966), the United States Supreme Court stated:
“We hold that the [Fifth Amendment] privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature....
[[Image here]]
“... [B]oth federal and state courts have usually held that if offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling ‘communications’ or ‘testimony,’ but that compulsion which makes a suspect or accused the source of ‘real or physical evidence’ does not violate it.”
(Footnotes omitted.) The Court held that the withdrawal and chemical analysis of blood from a drunk driving suspect was not testimonial or communicative in nature and, therefore, was not protected by the Fifth Amendment and Miranda. Schmerber, 384 U.S. at 765, 86 S.Ct. at 1832-33, 16 L.Ed.2d at 916-17. The United States Supreme Court has since held, and this court has applied that holding, that there is no right to refuse to take a chemical blood-alcohol test under the Fifth Amendment privilege or Miranda. South Dakota v. Neville, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983); O’Connor v. City of Montgomery, 462 So.2d 756 (Ala.Cr.App.1984).
We hold that the trial court did not err in allowing evidence of a field breath test and an Intoxilyzer 5000 breath test to be received into evidence.
Ill
The appellant next contends that State Trooper Ellis incorrectly testified that *145 the Intoxilyzer 5000 was administered in compliance with the rules and regulations of the Alabama Department of Forensic Sciences. He bases this contention on the Alabama Supreme Court’s holding in Ex parte Mayo, 652 So.2d 201 (Ala.1994).
In Mayo, the defendant contended that the trial court erred in denying his motion to suppress the results of the Intoxilyzer 5000 breath test administered to him to be received into evidence because the Department of Forensic Sciences had not promulgated rules and regulations for Alabama’s chemical testing program as required by § 32-5A-194(a)(1), Code of Alabama 1975. Section 32-5A-194(a)(l), Code of Alabama 1975, states:
“(1) Chemical analyses of the person’s blood, urine, breath or other bodily substance to be considered valid under the provisions of this section shall have been performed according to methods approved by the department of forensic sciences and by an individual possessing a valid permit issued by the department of forensic sciences for this purpose. The court trying the case may take judicial notice of methods approved by department of forensic sciences. The department of forensic sciences is authorized to approve satisfactory techniques or methods, to ascertain the qualifications and competence of individuals to conduct such analyses, and to issue permits which shall be subject to termination or revocation at the discretion of the department of forensic sciences. The department of forensic sciences shall not approve the permit required in this section for making tests for any law enforcement officer other than a member of the state highway patrol, a sheriff or his deputies, a city policeman or laboratory personnel employed by the department of forensic sciences.”
(Emphasis added.)
Before 1988, the State Board of Health was responsible for the state’s chemical testing program. Mayo, 652 So.2d at 203. In 1988, the legislature transferred this responsibility to the Department of Forensic Sciences but provided that all rules and regulations enacted by the Board of Health were to “remain in force until rescinded, modified or adopted by the Department of Forensic Sciences.” § 32-5A-194.1, Code of Alabama 1975. Regarding these rules, the Alabama Supreme Court stated:
“The only existing rules for breath testing were promulgated by the Board of Health in 1982 and were amended in 1982, 1984, and 1987. They have not been amended by [the Department of Forensic Sciences]; indeed, they are still in the Alabama Administrative Code in the chapter for rules of the State Board of Health/ the Department of Public Health. The breath testing rules are a single page long. Rule 1 states that an applicant for a testing permit ‘must have satisfactorily completed the course in the theory and operational procedures of the breath testing instrument and be a full-time employee for one of the agencies listed in Section 32-5A-194.’ Rule 2 regards permits: 2(a) provides that the permits will be ‘issued by the State Health Officer and certified by the Technical Director,’ 2(b) provides for expiration of permits, and 2(e) requires continuing education each year. Rule 3 is entitled ‘Methods Approved by the State Board of Health,’ and it reads:
“ ‘(a) There shall be a periodic inspection of each breath testing instrument. The inspection shall be conducted at reasonable time intervals set by the State Health Officer through the Technical Director.
“ ‘(b) Approval of Instrumentation.
“ ‘1. Intoxilyzer 5000. The approved procedure, technique or method of operation appears on the Intoxilyzer 5000 Operational Procedure Card.’
“(Emphasis added [in Mayo].) Rule 4 reads simply ‘Appendix.’
“Appended to the rules is a page with the heading ‘Intoxilyzer 5000 Operational Procedure,’ a form with blanks to be filled and steps to be marked as completed. It gives the following seven steps: ‘Attach Mouthpiece, Press Start Button, Insert Test Record, Subject Blows Sample, Time Sample Collected_, Remove Test Record, [and] Results_’ It includes a space marked ‘test record,’ where the *146 printout from the machine can be attached. The form on which [the defendant’s] breath test was recorded is substantially like this appendix, with two changes: It adds the statement WARNING: Subject must be under observation by the arresting officer and/or operator for a period of twenty minutes before the test is administered,’ and it adds an eighth step, ‘Remove mouthpiece.’ ”
Mayo, 652 So.2d at 204. The Court held that these rules “do not meet the requirement of § 32-5A-194(a)(l) that chemical analyses ‘shall have been performed according to methods approved by the department of forensic sciences.’ ” Mayo, 652 So.2d at 209. “At a minimum, [the Department of Forensic Sciences] should adopt these rules as its own and should adopt particularized rules to ensure that the Intoxilyzer 5000 machines are effectively inspected for accuracy and reliability.” Mayo, 652 So.2d at 209 (footnote omitted).
However, the Court in Mayo also held that the appellant’s conviction should not be reversed because “the results of a chemical test for intoxication may still be admitted if the prosecution establishes a sufficient predicate under traditional evidentiary rules for the admission of scientific test results.” Mayo, 652 So.2d at 209. Furthermore, the Court stated:
“In holding the existing rules inadequate under the showing made by Mayo, we note that this ruling will not apply to any other case already tried, unless the defendant in that case made a similar showing and objected to admission of the evidence of the test, on the ground that the statute did not make the evidence admissible. In cases arising hereafter but before the Department of Forensic Sciences adopts appropriate rules, if a defendant makes a sufficient objection to a breath test result, the prosecuting authority may have to lay a general evidentiary predicate to make evidence of the test admissible.”
Mayo, 652 So.2d at 211. (Emphasis added.)
Because the appellant was tried before Ex parte Mayo was decided, Mayo does not apply to his case. He did not make a similar showing and object as required for retroactive application of Mayo. Even if the appellant had followed the procedures outlined in Mayo, the record reflects that the state met the general evidentiary predicate required for admissibility of Intoxilyzer 5000 test results.
IV
The appellant last contends that the trial court erred by denying his motion for a judgment of acquittal. More specifically, he contends that the state presented insufficient evidence for the jury to find him guilty of homicide by vehicle.
“In determining whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, we must accept as true the evidence introduced by the state, accord the state all legitimate inferences therefrom, and view the evidence in the light most favorable to the prosecution. McMillian v. State, 594 So.2d 1253 (Ala.Cr.App.1991); Faircloth v. State, 471 So.2d 485 (Ala.Cr.App.1984), affid, 471 So.2d 493 (Ala.1985); Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.), cert, denied, 368 So.2d 877 (Ala.1979).”
Underwood v. State, 646 So.2d 692, 695 (Ala. Cr.App.1993).
The state presented sufficient evidence that the appellant was driving under the influence of alcohol and that he failed to stop for a stop sign, causing Bamberg’s death. “Where there is legal evidence from which the factfinder may, by fair inference, find the accused guilty, this court will not overturn the verdict.” McDonald v. State, 586 So.2d 259, 261 (Ala.Cr.App.1991). The evidence presented by the state was sufficient for the jury to find the appellant guilty of homicide by vehicle. We will not substitute our opinion for that of the jury. Owens v. State, 597 So.2d 734, 737 (Ala.Cr.App.1992).
For the foregoing reasons, the judgment in this case is due to be, and it is hereby, affirmed.
AFFIRMED.
All the Judges concur.